**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| RECORD STEEL AND CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2274C |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1), of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff, Record Steel and Construction, Inc., respectfully submits the following proposed findings of uncontroverted fact ("PPFUF"). Because the bulk of plaintiffs proposed findings of uncontroverted facts are supported by the appendix filed by defendant and part of the record of the case, plaintiff cites to Defendants' records as "App. _____," but plaintiff does not separately file the supporting documents referred to. Proposed findings supported by documentary evidence not yet in the record cite to the separately filed "Plaintiff's App. ____," or the Affidavit of Robert B. Stevens, P.E. in support of Record's cross-motion for partial summary judgment, as appropriate:

1. On or about October 15, 1999, the United States Department of the Army, Corps of Engineers (the "Army Corps") issued a solicitation for a Design/Build Multiple Award Task Order Contract for Construction Services Primarily on Air Force Bases in the states of

Washington, Oregon, Idaho, Montana, Wyoming, Colorado, North Dakota, South Dakota, Nebraska, Minnesota, Kansas, Missouri, Iowa, and Wisconsin (the "MATOC"). App. 1.

2. On or about November 23, 1999, Record Steel and Construction, Inc. ("Record Steel") submitted its proposal in response to the MATOC solicitation. App. 2.

3. On or about February 16, 2000, Record Steel was awarded an indefinite-delivery, indefinite-quantity contract pursuant to the MATOC solicitation. App. 2.

4. The indefinite-delivery, indefinite-quantity contract that Record Steel was awarded pursuant to the MATOC solicitation was contract number "DACA67-D-0202." App. 1.

5. On or about June 9, 2000, the Army Corps awarded Task Order #1, FY2000 Dormitory, Offut Air Force Base, Nebraska ("Task Order #1") under contract number DACA67-D-0202 to Record Steel. Compl. ¶ 4.

6. The basic award price for Task Order #1 was $8,799,428. Compl. ¶ 4.

7. Task Order #1 involved the design and construction of a dormitory at Offut Air Force Base, Nebraska. Compl. ¶ 4.

8. Section 01005, of the Request for Proposals for Task Order #1 (the "RFP") was captioned "Structural Requirements." App. 4.

9. Subparagraph 1.7.1 of Section 01005 of the RFP was captioned "Design Parameters." App. 12.

10. Section 01005, subparagraph 1.7.1 of the RFP provides that the "parameters used for foundation design, including overexcavation and compaction requirements, . . . shall be in accordance with the Final Foundation Analysis report provided." App. 12

11. The Final Foundation Analysis report referenced in Section 01005, subparagraph 1.7.1 of the RFP was attached to the RFP, but its title is "Foundation Analysis Report," not "Final Foundation Analysis." App. 12, 15-24.

12. In a section entitled "Subsurface Recommendations," paragraph 1.14 (entitled "Structural Foundations"), subparagraph 1.14.1 (entitled "Spread Footings on Engineered Fill"), the Foundation Analysis Report stated:

> 1.14.1 Spread Footings on Engineered Fill
> An analysis of undisturbed sample test data indicated that settlement governs the allowable bearing pressure of footings at this site. The settlement analysis predicted a footing movement greater than two inches with a nominal 2000 psf excess soil load on in situ material. Due to the anticipated column loads for a multi-story building, it is believed that improving the site is more viable than reducing the bearing pressure to a very low value. Analysis utilizing replacement of a portion of the subgrade with engineered fill yielded acceptable movement, on the order of one inch, when four feet of in situ soil was replaced with compacted select material. The recommended improvement program is outlined below:
>
> (a) An allowable bearing pressure of 2000 psf in excess of that due to the existing soil column should be used for design. Any load caused by fill added to the site above the current ground elevation should be subtracted from the bearing pressure.
> (b) Four (4) feet of material should be excavated from below the bottom elevation of all building footings.
> (c) Over excavation and replacement should extend a distance of at least four (4) feet beyond the outer edge of footings.
> (d) The exposed surface should be scarified, moisture conditioned, and recompacted to a density of not less than 95% of maximum Modified density for a depth of 12 inches.
> (e) The over excavation depth should be backfilled with moisture conditioned select material . . . . Loose lift thickness should not exceed 12 inches . . . .
> (f) Exposed subgrades should be backfilled in a timely manner and protected from excessive moisture loss or gain. In no instances should water be allowed to pond on or saturate the subgrade during construction. Footings should be placed and the area backfilled as soon as possible in order to protect the select backfill from moisture content change . . . .

(h) Floor slabs should have a minimum of eighteen inches of compacted select material below the capilary water barrier layer.

App. 19-20.

13. Section 1.18 of the Foundation Analysis Report indicates that its goal for the recommended program of over excavation was foundation performance that would achieve one inch or less of settlement, by stating:

> 1.18 Settlement
> Based on consolidation testing, Standard Penetration Tests results and experience with engineered fill, total settlement is not expected to exceed 1-inch if the over excavation and replacement programed outline above is followed. Differential settlement is not expected to exceed 0.5 inch.

App. 21.

14. When the Foundation Analysis Report mandated an element of design, it did not use equivocal language such as "anticipated," "it is believed," "more viable," "recommended," "should," and "if," but, rather, used mandatory language, as stating:

> "A vapor barrier overlaying a six-inch capillary water barrier shall be required . . . ." App. 20 (Report Section 1.15) (emphasis added);
>
> "lateral earth pressures on basement or retaining walls above the water table shall be calculated . . . . Lateral earth pressures below the water table shall be calculated . . . . An in situ soil dry density of 110 pcf shall be used for design purposes." App. 20 (Report Section 1.16) (emphasis added);
>
> "a modulus of subgrade reaction "K" of 150 pci shall be used for design purposes. Flexible pavement designs shall use . . . . If frost penetration is considered in the design of rigid or flexible pavements, the design shall be in accordance with . . . ." App. 21 (Report Section 1.17) (emphasis added);
>
> Therefore, sulfate-resistant cement will not be required . . . . where possible, all concrete specifications shall include the option . . . ." App. 21 (Report Section 1.19) (emphasis added);
>
> Maintain a minimum of 5 percent positive slope away from the building. Exit all downspouts at least 5 feet from building perimeter. Provide splash blocks for all

> exterior downspouts and water faucets. Avoid curbs and water traps adjacent to building. Footings shall be placed as soon as possible after foundation excavations are completed. Excavations should be backfilled as soon as possible and any ponded water in the excavations shall be removed immediately to prevent detrimental effects to the subsoils. App. 21 (Report Section 1.21) (emphasis added).

15. Section 01332 of the RFP was captioned "Submittals During Design." App. 25.

16. Subparagraph 1.6.1 of section 01332 of the RFP was captioned "Design Certification." App. 29.

17. Section 01332, subparagraph 1.6.1 of the RFP provided that "[t]he criteria specified in the RFP are binding contract criteria and in case of any conflict, after award, between the RFP criteria and Contractor's submittals, the RFP criteria will govern unless there is a written and signed agreement between the Contracting Officer and the Contractor waiving a specific requirement." App. 29.

18. The contract, through the government’s Foundation Analysis Report geotechnical report, merely recommended, but did not require over excavation. Instead, Record’s design could be “in accordance with” the geotechnical report without including over excavation as part of the design App. 15-21; Affidavit of Robert B. Stevens, P.E. ¶¶ 4-6.

19. By a letter dated January 14, 2000 (the "January letter"), Record Steel had submitted its initial price proposal in response to the RFP. App. 43.

20. In the January letter, Record Steel stated "[w]e understand that in the case of any conflicts after contract award between the requirements stated in the RFP and our proposal, the RFP shall govern." App. 43.

21. In the January letter, Record Steel informed the contracting officer that: “We would like to note that the borings taken for this project do not cover the area on the northern site and intend

to incorporate new borings into our design if awarded this project. We feel confident that over excavation for foundations will not be required. Should over excavation for the building footings be required RSCI [Record] will perform this work at no additional cost to the Government." App. 43.

22. In response to the Request for Final Revised Proposals issued by the contracting officer, Record Steel submitted a revised proposal on March 12, 2000 (the "March letter"). App. 44-51.

23. In the March letter, Record Steel stated "[w]e understand that in the case of any conflicts after contract award between the requirements stated in the RFP and our proposal, the RFP shall govern." App. 44.

24. In the March letter, Record Steel stated: "We would like to note that the borings taken for this project do not cover the area on the northern site and intend to incorporate new borings into our design if awarded this project. We feel confident that over excavation for foundations will not be required. Should over excavation for the building footings be required RSCI [Record] will perform this work at no additional cost to the Government." App. 44.

25. On June 9, 2000, the contracting officer held a pre-design meeting with Record Steel. App. 70.

26. During the pre-design meeting, over excavation was discussed. App. 70.

27. Consistent with Record's January and March letters, prior to the pre-design meeting, Record had obtained information and guidance from a local geotechnical firm, Great Plains Testing Laboratories, that indicated that over excavation would not be required as a matter of sound engineering design. At the pre-design meeting after award of the project the exclusion of over excavation was discussed and it was determined that RSCI [Record] would again employ

Great Plains, this time to conduct a field investigation of the site to provide RSCI & COE with documentation that over excavation would not be needed. If this data were found to be satisfactory then RSCI would continue design without over excavation as proposed. App. 54.

28. Great Plains conducted a field investigation of the site, concluding its Report of Geotechnical Investigation for FY 2000 Dormitory Nelson Drive Offutt Air Force Base Bellevue, Nebraska, that "in light of the subsurface conditions revealed by the boring and testing program, this site appears suitable for use of a shallow spread foundation system." Plaintiff's App. 1-34, 8 (quoted language).

29. On August 23, 2000, Great Plains issued a report containing an opinion by John Christiamsen that native soil could be used beneath the footings. Plaintiff's App. 1-34.

30. During the 100% Civil and Structural Design review/60% "All Other Design" review, Mr. Brad Jones of the COE raised the question of the conflict between the RFP recommendation to over excavate and the geotechnical recommendation to the contrary. The comment asked for the basis for this recommendation to not over excavate, which had already been provided in the Great Plains Investigation report, and did not state any disagreement with the decision. App. 54.

31. A Design Review meeting was held on October 3, 2000. App. 71.

32. At the October 3, 2000 Design Review meeting, the parties discussed the need for over excavation. App. 71.

33. The decision not to over excavate was brought up again in the Design Review meeting conducted on October 3, 2000, at which both Mr. Jones and Mr. Christiansen of Great Plains were present and able to discuss the test results and Great Plains' recommendation. It was determined that Great Plains would conduct nuclear density testing of the native soil at actual

footing depth since the building footprint had been excavated and provide it to Mr. Jones. App. 54-55.

34. The Army Corps and Great Plains took samples for concurrent testing on October 6, 2000. App. 71.

35. Great Plains' testing was completed on October 10, 2000 and results again verified that the native soils were not collapse susceptible and were suitable to accept the building footings, as Great Plains stated in an October 20, 2000 letter enclosing the test results: "Based on these results, and the results of our geotechnical investigation (GPTL Project Number G0395J), we believe that the soils below footing level at the dormitory site are not collapse susceptible. In our professional opinion, dormitory foundations can safely rest on natural site soils, and overexcavation and recompaction of the soil below foundation level is not necessary." App. 55; Plaintiffs App. 35-44, 36 (quoted language).

36. By letter dated October 19, 2000, the contracting officer informed Record Steel that it "would not be issued notice to proceed for the footings on this project until your firm complies will [sic] the requirements of the subsurface recommendations of the Foundation Analysis Report." App. 52.

37. Consistent with the fact that the contract does not require over excavation, the contracting officer asserted that he would require over excavation based on the government's decision regarding the testing that had been performed, not based on a contractual requirement, stating: "This is due to existing soil conditions as confirmed by our testing laboratory as well as the test data provided by your firm." App. 52.

38. By a letter dated April 25, 2002, Record Steel submitted a certified claim to the contracting officer, seeking $137,714 for additional costs allegedly incurred during the performance of Task Order #1 because of the over excavation. App. 54-67.

39. On September 16, 2002, the contracting officer sent a letter to Record Steel, setting forth the facts of the claim and inviting Record Steel to make any suggested corrections or additions to those facts. App. 68-69.

40. The contracting officer denied Record Steel's claim in a final decision dated November 7, 2002 (the "Final Decision"). App. 70-72; Compl. ¶ 14.

41. Record Steel received the contracting officer's Final Decision on November 12, 2002. App. 70.

42. The government issue its contractor “Performance Evaluation” pursuant to the contract on December 9, 2002. Plaintiff’s App. 45-48.

43. Record responded to the government’s Performance Evaluation on January 7, 2003, and requested its marginal scores be re-evaluated and changed to accurately reflect its performance. Plaintiff’s App. 49-50.

44. Record believes that the substance of the government’s Performance Evaluation is related to the dispute concerning over excavation. Plaintiff’s App 49; Compl. ¶¶ 20-21.

///

///

///

45. The government denied the requested re-evaluation on February 10, 2003. Plaintiff's App. 51.

Respectfully submitted,

s/ John Spencer Stewart
John Spencer Stewart
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706; (503) 419-0281

Dated: June 7, 2004

Of Counsel:

Robert B. Coleman
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706

W:\WORK\RBC\Record Steel\Offut\Pleadings\PFUF.Cross.wpd

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of June, 2004, a copy of the foregoing Plaintiff's Proposed Findings of Uncontroverted Fact was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John Spencer Stewart
John Spencer Stewart
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706; (503) 419-0281

Dated: June 7, 2004

Of Counsel:

Robert B. Coleman
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706