**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| RECORD STEEL AND CONSTRUCTION, INC., Plaintiff, | ) | |
| v. | ) | No. 03-2274C (Judge Lettow) |
| THE UNITED STATES, Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2), of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff, Record Steel and Construction, Inc., respectfully submits the following responses to defendant's proposed findings of uncontroverted fact, as follows:

1. On or about October 15, 1999, the United States Department of the Army, Corps of Engineers (the "Army Corps") issued a solicitation for a Design/Build Multiple Award Task Order Contract for Construction Services Primarily on Air Force Bases in the states of Washington, Oregon, Idaho, Montana, Wyoming, Colorado, North Dakota, South Dakota, Nebraska, Minnesota, Kansas, Missouri, Iowa, and Wisconsin (the "MATOC"). App. 1.[1]

**Response**: Agrees.

2. On or about November 23, 1999, Record Steel and Construction, Inc. ("Record Steel") submitted its proposal in response to the MATOC solicitation. App. 2.

[1] "App. __" refers to the appendix to our motion for partial summary judgment.

**Response**: Agrees.

3. On or about February 16, 2000, Record Steel was awarded an indefinite-delivery, indefinite-quantity contract pursuant to the MATOC solicitation. App. 2.

**Response**: Agrees.

4. The indefinite-delivery, indefinite-quantity contract that Record Steel was awarded pursuant to the MATOC solicitation was contract number "DACA67-D-0202." App. 1.

**Response**: Agrees.

5. On or about June 9, 2000, the Army Corps awarded Task Order #1, FY2000 Dormitory, Offut Air Force Base, Nebraska ("Task Order #1") under contract number DACA67-D-0202 to Record Steel. Compl. ¶ 4.

**Response**: Agrees.

6. The basic award price for Task Order #1 was $8,799,428. Compl. ¶ 4.

**Response**: Agrees.

7. Task Order #1 involved the design and construction of a dormitory at Offut Air Force Base, Nebraska. Compl. ¶ 4.

**Response**: Agrees.

8. Section 01005, of the Request for Proposals for Task Order #1 (the "RFP") was captioned "Structural Requirements." App. 4.

**Response**: Agrees.

9. Subparagraph 1.7.1 of Section 01005 of the RFP was captioned "Design Parameters." App. 12.

**Response**: Agrees.

10. Section 01005, subparagraph 1.7.1 of the RFP provides that the "parameters used for foundation design, including overexcavation and compaction requirements, . . . shall be in accordance with the Final Foundation Analysis report provided." App. 12

**Response**: Agrees.

11. The Final Foundation Analysis report (the "Final Foundation Analysis") referenced in Section 01005, subparagraph 1.7.1 of the RFP was attached to the RFP. App. 12, 15-24.

**Response**: Disagrees, because the proposed finding implies that the title of the report attached to the RPF was the "Final Foundation Analysis." The correct title of the report is "Foundation Analysis Report." App. 15.

12. In a section entitled "Subsurface Recommendations," paragraph 1.14 (entitled "Structural Foundations"), subparagraph 1.14.1 (entitled "Spread Footings on Engineered Fill"), the Final Foundation Analysis stated:

> Due to the anticipated column loads for a multi-story building, it is believed that improving the site is more viable than reducing the bearing pressure to a very low value. Analysis utilizing replacement of a portion of the subgrade with engineered fill yielded acceptable movement, on the order of one inch, when four feet of in situ soil was replaced with compacted select material. The recommended improvement program is outlined below.
> . . .
> (b) Four (4) feet of material should be excavated from below the bottom elevation of all building footings.
>
> (c) Over excavation and replacement should extend a distance of at least four (4) feet beyond the outer edge of the footings.
>
> . . .
>
> (e) The over excavation depth should be backfilled with moisture conditioned select material meeting the following specification at a density of not less than 95% of maximum Modified density.

App. 19-20.

**Response**: Disagrees with the finding as stated, because it is not a complete version of all the relevant portions of subparagraph 1.14.1 of the Foundation Analysis Report. Record proposes that the finding be revised to include the following relevant portions of subparagraph 1.14.1

> 1.14.1 Spread Footings on Engineered Fill
> An analysis of undisturbed sample test data indicated that settlement governs the allowable bearing pressure of footings at this site. The settlement analysis predicted a footing movement greater than two inches with a nominal 2000 psf excess soil load on in situ material. Due to the anticipated column loads for a multi-story building, it is believed that improving the site is more viable than reducing the bearing pressure to a very low value. Analysis utilizing replacement of a portion of the subgrade with engineered fill yielded acceptable movement, on the order of one inch, when four feet of in situ soil was replaced with compacted select material. The recommended improvement program is outlined below:
>
> (a) An allowable bearing pressure of 2000 psf in excess of that due to the existing soil column should be used for design. Any load caused by fill added to the site above the current ground elevation should be subtracted from the bearing pressure.
> (b) Four (4) feet of material should be excavated from below the bottom elevation of all building footings.
> (c) Over excavation and replacement should extend a distance of at least four (4) feet beyond the outer edge of footings.
> (d) The exposed surface should be scarified, moisture conditioned, and recompacted to a density of not less than 95% of maximum Modified density for a depth of 12 inches.
> (e) The over excavation depth should be backfilled with moisture conditioned select material . . . . Loose lift thickness should not exceed 12 inches . . . .
> (f) Exposed subgrades should be backfilled in a timely manner and protected from excessive moisture loss or gain. In no instances should water be allowed to pond on or saturate the subgrade during construction. Footings should be placed and the area backfilled as soon as possible in order to protect the select backfill from moisture content change . . . .
> (h) Floor slabs should have a minimum of eighteen inches of compacted select material below the capilary water barrier layer.

13. Section 01332 of the RFP was captioned "Submittals During Design." App. 25.

**Response**: Agrees.

14. Subparagraph 1.6.1 of section 01332 of the RFP was captioned "Design Certification." App. 29.

**Response**: Agrees.

15. Section 01332, subparagraph 1.6.1 of the RFP provided that "[t]he criteria specified in the RFP are binding contract criteria and in case of any conflict, after award, between the RFP criteria and Contractor's submittals, the RFP criteria will govern unless there is a written and signed agreement between the Contracting Officer and the Contractor waiving a specific requirement." App. 29.

**Response**: Agrees.

16. The Government never provided Record Steel with a signed agreement waiving the over excavation requirement.

**Response**: Disagrees; there is no over excavation requirement, and thus no over excavation requirement that the government might sign in writing. As stated in detail in plaintiff's memorandum in support of its cross-motion for partial summary judgment, and it plaintiff's proposed findings of uncontroverted facts in support of its cross-motion, the plain language of the contract did not require over excavation, and no reasonable engineer reading the goverment's geotechnical report and the contract would have concluded that the geotechnical report required over excavation. At most, the contract is latently ambiguous, and Record's reading of the contract is reasonable. Record proposes that the finding be revised to read as follows:

> The contract, through the government's geotechnical report, merely recommended, but did not require over excavation. Instead, Record's design

could be “in accordance with” the geotechnical report without including over excavation as part of the design. App. 12, 15-24.

17. By a letter dated January 14, 2000 (the "January letter"), Record Steel had submitted its initial price proposal in response to the RFP. App. 43.

**Response**: Agrees.

18. In the January letter, Record Steel stated "[w]e understand that in the case of any conflicts after contract award between the requirements stated in the RFP and our proposal, the RFP shall govern." App. 43.

**Response**: Agrees.

19. In the January letter, Record Steel stated "[w]e feel confident that over excavation for foundations will not be required. Should over excavation for the building foundations be required RSCI [Record Steel] will perform this work at no additional cost to the Government." App. 43.

**Response**: Agrees, but notes that the finding does not include all relevant portions of the cited letter. The relevant portions of the cited letter are provided below in Record’s propose revision of finding 20.

20. In the January letter, Record Steel informed the contracting officer that it intended to incorporate new borings into its design if it was awarded the contract. App. 43.

**Response**: Agrees, but notes that the proposed finding is incomplete. Record proposes that the finding be revised, to read as follows:

In the January letter, Record informed the contracting officer that: “We would like to note that the borings taken for this project do not cover the area on the

northern site and intend to incorporate new borings into our design if awarded this project. We feel confident that over excavation for foundations will not be required. Should over excavation for the building footings be required RSCI [Record] will perform this work at no additional cost to the Government." App. 43.

21. In response to the Request for Final Revised Proposals issued by the contracting officer, Record Steel submitted a revised proposal on March 12, 2000 (the "March letter"). App. 44-51.

**Response**: Agrees.

22. In the March letter, Record Steel stated "[w]e understand that in the case of any conflicts after contract award between the requirements stated in the RFP and our proposal, the RFP shall govern." App. 44.

**Response**: Agrees.

23. In the March letter, Record Steel stated "[w]e feel confident that over excavation for foundations will not be required. Should over excavation for the building foundations be required RSCI [Record Steel] will perform this work at no additional cost to the Government." App. 44.

**Response**: Agrees, but notes that the proposed finding is incomplete. The cited letter contains the exact same language as the January letter; accordingly, Record proposes that the finding be amended to replace the language in quotations with the language in quotations in the propose revision to finding 20.

24. In the March letter, Record Steel informed the contracting officer that it intended to incorporate new borings into the design if it was awarded the contract. App. 44.

**Response**: Agrees, but only to the extent stated in response to finding 23.

25. On June 9, 2000, the contracting officer held a pre-design meeting with Record Steel. App. 70.

**Response**: Agrees.

26. During the pre-design meeting, over excavation was discussed. App. 70.

**Response**: Agrees.

27. During the pre-design meeting, it was decided that Record Steel would have Great Plains Testing Laboratories ("Great Plains") conduct a field investigation of the site to provide information to the parties regarding over excavation. App. 70.

**Response**: Disagrees. Record had, as indicated in its January and March letters, already decided independently that it would obtain an additional, more precise, and less equivocal geotechnical report for its designer, WJA, to use in designing the project. App. at 43-44; Stevens Affidavit at . In addition, what was discussed at the pre-design meeting is not relevant to the issue of what the plain language of the contract requires. In addition, the proposed finding does not accurately reflect what was discussed during the pre-design meeting; Record proposes that the finding be revised to state:

> Consistent with Record's January and March letters, prior to the pre-design meeting, Record had obtained information and guidance from a local geotechnical firm, Great Plains Testing Laboratories, that indicated that over excavation would not be required as a matter of sound engineering design. At the pre-design meeting after award of the project the exclusion of over excavation was discussed and it was determined that RSCI [Record] would again employ Great Plains, this

time to conduct a field investigation of the site to provide RSCI & COE with documentation that over excavation would not be needed. If this data were found to be satisfactory then RSCI would continue design without over excavation as proposed. App. 54.

28. Great Plains conducted a field investigation of the site. App. 71.

**Response**: Agrees, but notes that the finding is incomplete. Great Plains concluded that over excavation was not required. Plaintiffs App. 1-34.

29. On August 23, 2000, Great Plains issued a report containing an opinion by John Christiamsen that native soil could be used beneath the footings. App. 71

**Response**: Agrees, but notes that the finding is incomplete. Great Plains concluded that over excavation was not required. Plaintiffs App. 1-34.

30. During the 100% Civil and Structural Design review/60% "All Other Design" review, the contracting officer noted the conflict between the RFP's over excavation language and Great Plains' report. App. 71.

**Response**: Disagrees. During the review referenced, the government asked for the basis of the recommendation not to over excavate, which already had been provided, and did not state any disagreement with the decision to over excavate. App. 54. Record proposes that the finding be revised to state:

> During the 100% Civil and Structural Design review/60% “All Other Design” review, Mr. Brad Jones of the COE raised the question of the conflict between the RFP recommendation to over excavate and the geotechnical recommendation to the contrary. The comment asked for the basis for this recommendation to not

over excavate, which had already been provided in the Great Plains Investigation report, and did not state any disagreement with the decision. App. 54.

31. A Design Review meeting was held on October 3, 2000. App. 71.

**Response**: Agrees.

32. At the October 3, 2000 Design Review meeting, the parties discussed the need for over excavation. App. 71.

**Response**: Agrees.

33. At the October 3, 2000 Design Review meeting, the Army Corps and Record Steel agreed that nuclear density testing would be conducted at the actual footing depth. App. 71.

**Response**: Disagrees, because the finding does not accurately reflect the discussion of October 3, 2000 during the referenced meeting. Record proposes that the finding be revised to state:

> The decision not to over excavate was brought up again in the Design Review meeting conducted on October 3, 2000, at which both Mr. Jones and Mr. Christiansen of Great Plains were present and able to discuss the test results and Great Plains' recommendation. It was determined that Great Plains would conduct nuclear density testing of the native soil at actual footing depth since the building footprint had been excavated and provide it to Mr. Jones. App. 54-55.

34. The Army Corps and Great Plains took samples for concurrent testing on October 6, 2000. App. 71.

**Response**: Agrees.

35. On October 10, 2000, Great Plains informed Record Steel that its tests indicated that native soil was sufficient to accept the building's footings. App. 71.

**Response**: Agrees, but notes that the finding is incomplete. Record proposes that the finding be revised to state: "Great Plains' testing was completed on October 10, 2000 and results again verified that the native soils were not collapse susceptible and were suitable to accept the building footings." App. 55; Plaintiff's App. 35-36.

36. By letter dated October 19, 2000, the contracting officer informed Record Steel that it "would not be issued notice to proceed for the footings on this project until your firm complies will [sic] the requirements of the subsurface recommendations of the Foundation Analysis Report." App. 52.

**Response**: Agrees.

37. By letter dated October 19, 2000, the contracting officer asserted that the decision to require over excavation was "due to the existing soil conditions confirmed by our testing laboratory as well as the test data provided by your firm." App. 52.

**Response**: Agrees, but notes that the finding is incomplete. Record proposes that the finding state: "Consistent with the fact that the contract does not require over excavation, the contracting officer asserted that he would require over excavation based on the government's decision regarding the testing that had been performed, not based on a contractual requirement." App. 52.

38. By letter dated October 19, 2000, the contracting officer reduced the required density requirement from 95 percent to 92 percent of maximum modified density. App. 52.

**Response**: Agrees, but notes that the fact is not relevant to either motion for summary judgment.

39. By letter dated October 23, 2000, the contracting officer advised Record Steel that the over excavated soil could be reinstalled and compacted to meet the requirements of backfill under the footings after over excavation. App. 53.

**Response**: Agrees, but notes that the fact is not relevant to either motion for summary judgment.

40. By a letter dated April 25, 2002, Record Steel submitted a certified claim to the contracting officer, seeking $137,714 for additional costs allegedly incurred during the performance of Task Order #1 because of the over excavation. App. 54-67.

**Response**: Agrees.

41. On September 16, 2002, the contracting officer sent a letter to Record Steel, setting forth the facts of the claim and inviting Record Steel to make any suggested corrections or additions to those facts. App. 68-69.

**Response**: Agrees.

42. Record Steel did not respond with any corrections or additions. App. 71.

**Response**: Agrees.

43. The contracting officer denied Record Steel's claim in a final decision dated November 7, 2002 (the "Final Decision"). App. 70-72; Compl. ¶ 14.

**Response**: Agrees.

44. The Final Decision provided that the solicitation documents "included a requirement to over excavate the footing as part of the design and construction." App. 71.

**Response**: Agrees that the Final Decision so provided, but disputes that the solicitation documents included a requirement over excavate the footing as part of the design and construction. Whether over excavation was a requirement is a question of law so long as the parties' agreement is unambiguous, not a question of fact for the contracting officer to decide. The contracting officer's opinion is entitled to no deference, and as a matter of law, the solicitation documents that formed the parties' agreement did not require over excavation.

45. The Final Decision noted that Record Steel's response to the solicitation had provided that if over excavation was necessary, it would be performed at no additional cost to the Government. App. 70-71.

**Response**: Agrees, but notes that the contracting officer's observations, notes, and opinions in his final decision are entitled to no deference whatsoever.

46. In the Final Decision, the contracting officer observed that while Record Steel had proposed a possible alternative to over excavation, which the Government considered in good faith, the Government never executed a modification changing Record Steel's responsibilities under the contract. App. 71-72.

**Response**: Agrees, but notes that the contracting officer's observations, notes, and opinions in his final decision are entitled to no deference whatsoever.

47. The Final Decision provided that Record Steel "did no more work, in over excavating the foundations, than was explicitly required by the contract. There is, therefore, no basis upon which to find merit in your claim" App. 72

**Response**: Agrees, but notes that the contracting officer's observations, notes, opinions and decision is entitled to no deference whatsoever.

///

///

///

///

///

///

48. Record Steel received the contracting officer's Final Decision on November 12, 2002.

App. 70.

**Response**: Agrees.

Respectfully submitted,

s/ John Spencer Stewart

John Spencer Stewart
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706; (503) 419-0281

Dated: June 7, 2004

Of Counsel:

Robert B. Coleman
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706

W:\WORK\RBC\Record Steel\Offut\Pleadings\PFUF.Responsewpd.wpd

CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of June, 2004, a copy of the foregoing Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John Spencer Stewart
John Spencer Stewart
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706; (503) 419-0281

Dated: June 7, 2004

Of Counsel:

Robert B. Coleman
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706