**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| RECORD STEEL AND CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2274C (Judge Lettow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**<u>PROPOSED FINDINGS OF UNCONTROVERTED FACT</u>**

Pursuant to Rule 56(h)(2), of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following response to the plaintiff's proposed findings of uncontroverted fact:

1. On or about October 15, 1999, the United States Department of the Army, Corps of Engineers (the "Army Corps") issued a solicitation for a Design/Build Multiple Award Task Order Contract for Construction Services Primarily on Air Force Bases in the states of Washington, Oregon, Idaho, Montana, Wyoming, Colorado, North Dakota, South Dakota, Nebraska, Minnesota, Kansas, Missouri, Iowa, and Wisconsin (the "MATOC"). App. 1.[1]

**<u>Response</u>:** Agrees.

[1] "App. __" refers to the appendix to defendant's motion for partial summary judgment.

2. On or about November 23, 1999, Record Steel and Construction, Inc. ("Record Steel") submitted its proposal in response to the MATOC solicitation. App. 2.

**Response:** Agrees.

3. On or about February 16, 2000, Record Steel was awarded an indefinite-delivery, indefinite-quantity contract pursuant to the MATOC solicitation. App. 2.

**Response**: Agrees.

4. The indefinite-delivery, indefinite-quantity contract that Record Steel was awarded pursuant to the MATOC solicitation was contract number "DACA67-D-0202." App. 1.

**Response:** Agrees.

5. On or about June 9, 2000, the Army Corps awarded Task Order #1, FY2000 Dormitory, Offut Air Force Base, Nebraska ("Task Order #1") under contract number DACA67-D-0202 to Record Steel. Compl. ¶ 4.

**Response:** Agrees.

6. The basic award price for Task Order #1 was $8,799,428. Compl. ¶ 4.

**Response:** Agrees.

7. Task Order # 1 involved the design and construction of a dormitory at Offut Air Force Base, Nebraska. Compl. ¶ 4.

**Response:** Agrees.

8. Section 01005, of the Request for Proposals for Task Order #1 (the "RFP") was captioned "Structural Requirements." App. 4.

**Response:** Agrees.

9. Subparagraph 1.7.1 of Section 01005 of the RFP was captioned "Design Parameters." App. 12.

**Response:** Agrees.

10. Section 01005, subparagraph 1.7.1 of the RFP provides that the "parameters used for foundation design, including overexcavation and compaction requirements, . . . shall be in accordance with the Final Foundation Analysis report provided." App. 12

**Response:** Agrees.

11. The Final Foundation Analysis report referenced in Section 01005, subparagraph 1.7.1 of the RFP was attached to the RFP, but its title is "Foundation Analysis Report," not "Final Foundation Analysis." App. 12, 15-24.

**Response:** Agrees.

12. In a section entitled "Subsurface Recommendations," paragraph 1.14 (entitled "Structural Foundations"), subparagraph 1.14.1 (entitled "Spread Footings on Engineered Fill"), the Foundation Analysis Report stated:

> 1.14.1 Spread Footings on Engineered Fill
> An analysis of undisturbed sample test data indicated that settlement governs the allowable bearing pressure of footings at this site. The settlement analysis predicted a footing movement greater than two inches with a nominal 2000 psf excess soil load on in situ material. Due to the anticipated column loads for a multi-story building, it is believed that improving the site is more viable than reducing the bearing pressure to a very low value. Analysis utilizing replacement of a portion of the subgrade with engineered fill yielded acceptable movement, on the order of one inch, when four feet of in situ soil was replaced with compacted select material. The recommended improvement program is outlined below:
>
> (a) An allowable bearing pressure of 2000 psf in excess of that due to the existing soil column should be used for design. Any load caused by fill added to the site above the current ground elevation should be subtracted from the bearing pressure.
> (b) Four (4) feet of material should be excavated from below the bottom elevation of all building footings.
> (c) Over excavation and replacement should extend a distance of at least four (4) feet beyond the outer edge of footings.
> (d) The exposed surface should be scarified, moisture conditioned, and recompacted to a density of not less than 95% of maximum Modified density for a depth of 12 inches.
> (e) The over excavation depth should be backfilled with moisture conditioned select material . . . . Loose lift thickness should not exceed 12 inches . . . .
> (f) Exposed subgrades should be backfilled in a timely manner and protected from excessive moisture loss or gain. In no instances should water be allowed to pond on or saturate the subgrade during construction. Footings should be placed and the area backfilled as soon as possible in order to protect the select backfill from moisture content change . . . .
> (h) Floor slabs should have a minimum of eighteen inches of compacted select material below the capilary water barrier layer.

App. 19-20.

**Response:** Disagrees to the extent that the plaintiff's proposed version also contains potentially relevant omissions (including portions of subparagraph (e) and (f), and all of subparagraph (g))

and contains a minor typographical error adding emphasis not found in the original Report or otherwise designated as "emphasis added" by plaintiff, but agrees that the sections provided are otherwise accurate.

13. Section 1.18 of the Foundation Analysis Report indicates that its goal for the recommended program of over excavation was foundation performance that would achieve one inch or less of settlement, by stating:

> 1.18 Settlement
> Based on consolidation testing, Standard Penetration Tests results and experience with engineered fill, total settlement is not expected to exceed 1-inch if the over excavation and replacement programed outline above is followed. Differential settlement is not expected to exceed 0.5 inch.

App. 21.

**Response:** Disagrees with plaintiff's conclusions that the Foundation Analysis Report indicated a "goal for the recommended program of over excavation." Otherwise agrees that the quoted language is accurate.

14. When the Foundation Analysis Report mandated an element of design, it did not use equivocal language such as "anticipated," "it is believed," "more viable," "recommended," "should," and "if," but, rather, used mandatory language, as stating:

> "A vapor barrier overlaying a six-inch capillary water barrier shall be required ...." App. 20 (Report Section 1.15) (emphasis added);

> "lateral earth pressures on basement or retaining walls above the water table shall be calculated .... Lateral earth pressures below the water table shall be calculated .... An in situ soil dry density of 110 pcf shall be used for design purposes." App. 20 (Report Section 1.16) (emphasis added);

"a modulus of subgrade reaction "K" of 150 pci shall be used for design purposes. Flexible pavement designs shall use . . . . If frost penetration is considered in the design of rigid or flexible pavements, the design shall be in accordance with . . ." App. 21 (Report Section 1.17) (emphasis added);

Therefore, sulfate-resistant cement will not be required .... where possible, all concrete specifications shall include the option ...." App. 21 (Report Section 1.19) (emphasis added);

Maintain a minimum of 5 percent positive slope away from the building. Exit all downspouts at least 5 feet from building perimeter. Provide splash blocks for all exterior downspouts and water faucets. Avoid curbs and water traps adjacent to building. Footings shall be placed as soon as possible after foundation excavations are completed. Excavations should be backfilled as soon as possible and any ponded water in the excavations shall be removed immediately to prevent detrimental effects to the subsoils. App. 21 (Report Section 1.21) (emphasis added).

**Response:** Disagrees with plaintiff's conclusions that the Foundation Analysis Report itself mandated any elements of design. The Foundation Analysis Report mandated elements of design only to the extent that they were integrated as requirements into the contract. Otherwise agrees that the quoted language is generally accurate, but notes that the citations contain potentially relevant omissions.

15. Section 01332 of the RFP was captioned "Submittals During Design." App. 25.

**Response:** Agrees.

16. Subparagraph 1.6.1 of section 01332 of the RFP was captioned "Design Certification." App. 29.

**Response:** Agrees.

17. Section 01332, subparagraph 1.6.1 of the RFP provided that "[t]he criteria specified in the RFP are binding contract criteria and in case of any conflict, after award, between the RFP criteria and Contractor's submittals, the RFP criteria will govern unless there is a written and signed agreement between the Contracting Officer and the Contractor waiving a specific requirement." App. 29.

**Response:** Agrees.

18. The contract, through the government's Foundation Analysis Report geotechnical report, merely recommended, but did not require over excavation. Instead, Record's design could be "in accordance with" the geotechnical report without including over excavation as part of the design. App. 15-21; Affidavit of Robert Stevens, P.E. ¶¶ 4-6.

**Response:** The findings contained in paragraph 18 are conclusions of law, to which no response is required; to the extent that they may be deemed findings of fact, disagrees. The contract requires over excavation. There is no provision in the contract that allows Record Steel to produce a design "in accordance with" a geotechnical report produced by a third party without the Government's written consent to a waiver of the contractual requirement for over excavation.

19. By a letter dated January 14, 2000 (the "January letter"), Record Steel had submitted its initial price proposal in response to the RFP. App. 43.

**Response:** Agrees.

20. In the January letter, Record Steel stated "[w]e understand that in the case of any conflicts after contract award betwen the requirements stated in the RFP and our proposal, the RFP shall govern." App. 43.

**Response:** Agrees.

21. In the January letter, Record Steel informed the contracting officer that: "We would like to note that the borings taken for this project do not cover the area on the northern site and intend to incorporate new borings into our design if awarded this project. We feel confident that over excavation for foundations will not be required. Should over excavation for the building footings be required RSCI [Record] will perform this work at no additional cost to the Government." App. 43.

**Response:** Agrees.

22. In response to the Request for Final Revised Proposals issued by the contracting officer, Record Steel submitted a revised proposal on March 12, 2000 (the "March letter"). App. 44-51.

**Response:** Agrees.

23. In the March letter, Record Steel stated "[w]e understand that in the case of any conflicts after contract award between the requirements stated in the RFP and our proposal, the RFP shall govern."

App. 44.

**Response:** Agrees.

24. In the March letter, Record Steel stated: "We would like to note that the borings taken for this project do not cover the area on the northern site and intend to incorporate new borings into our design if awarded this project. We feel confident that over excavation for foundations will not be required. Should over excavation for the building footings be required RSCI [Record] will perform this work at no additional cost to the Government." App. 44.

**Response:** Agrees.

25. On June 9, 2000, the contracting officer held a pre-design meeting with Record Steel. App. 70.

**Response:** Agrees.

26. During the pre-design meeting, over excavation was discussed. App. 70.

**Response:** Agrees.

27. Consistent with Record's January and March letters, prior to the pre-design meeting, Record had obtained information and guidance from a local geotechnical firm, Great Plains Testing Laboratories, that indicated that over excavation would not be required as a matter of sound engineering design. At the pre-design meeting after award of the project the exclusion of over excavation was discussed and it was determined that RSCI [Record] would again employ Great Plains, this time to conduct a field investigation of the site to provide RSCI & COE with documentation that over excavation would not be needed. If this data were found to be satisfactory then RSCI would continue design without over excavation as proposed. App. 54. 28.

**Response:** Disagrees to the extent that Record Steel implies that over excavation was not required by the contract. Agrees, however, that the Government, in good faith, agreed to consider waiving the over excavation requirement based upon further field investigation.

28. Great Plains conducted a field investigation of the site, concluding its Report of Geotechnical Investigation for FY 2000 Dormitory Nelson Drive Offutt Air Force Base Bellevue, Nebraska, that "in light of the subsurface conditions revealed by the boring and testing program, this site appears suitable for use of a shallow spread foundation system." Plaintiff's App. 1-34, 8 (quoted language).

**Response:** Agrees.

29. On August 23, 2000, Great Plains issued a report containing an opinion by John Christiamsen that native soil could be used beneath the footings. Plaintiff's App. 1-34.

**Response:** Agrees.

30. During the 100% Civil and Structural Design review/60% "All Other Design" review, Mr. Brad Jones of the COE raised the question of the conflict between the RFP recommendation to over excavate and the geotechnical recommendation to the contrary. The comment asked for the basis for this recommendation to not over excavate, which had already been provided in the Great Plains Investigation report, and did not state any disagreement with the decision. App. 54. 31.

**Response:** Disagrees. See Def. Proposed Findings of Fact ¶ 30. The RFP required over excavation by its explicit terms. Further, at no point during the 100% Civil and Structural Design review/60% "All Other Design" review or at any other meeting did Mr. Brad Jones indicate any agreement with the Great Plains Investigation report and its conclusion that over excavation was not required.

31. A Design Review meeting was held on October 3, 2000. App. 71.

**Response**: Agrees.

32. At the October 3, 2000 Design Review meeting, the parties discussed the need for over excavation. App. 71.

**Response**: Agrees.

33. The decision not to over excavate was brought up again in the Design Review meeting conducted on October 3, 2000, at which both Mr. Jones and Mr. Christiansen of Great Plains were present and able to discuss the test results and Great Plains' recommendation. It was determined that Great Plains would conduct nuclear density testing of the native soil at actual footing depth since the building footprint had been excavated and provide it to Mr. Jones. App. 54-55.

**Response:** Agrees.

34. The Army Corps and Great Plains took samples for concurrent testing on October 6, 2000. App. 71.

**Response**: Agrees.

35. Great Plains' testing was completed on October 10, 2000 and results again verified that the native soils were not collapse susceptible and were suitable to accept the building footings, as Great Plains stated in an October 20, 2000 letter enclosing the test results: "Based on these results, and the results of our geotechnical investigation (GPTL Project Number G0395J), we believe that the soils below footing level at the dormitory site are not collapse susceptible. In our professional opinion, dormitory foundations can safely rest on natural site soils, and overexcavation and recompaction of the soil below foundation level is not necessary." App. 55; Plaintiffs App. 35-44, 36 (quoted language).

**Response**: Agrees that the quoted language accurately reflects Great Plains' report, however, disagrees with the conclusion that "native soils were not collapse susceptible and were suitable to accept the building footings."

36. By letter dated October 19, 2000, the contracting officer informed Record Steel that it "would not be issued notice to proceed for the footings on this project until your firm complies will [sic] the requirements of the subsurface recommendations of the Foundation Analysis Report." App. 52.

**Response**: Agrees.

37. Consistent with the fact that the contract does not require over excavation, the contracting officer asserted that he would require over excavation based on the government's decision regarding the testing that had been performed, not based on a contractual requirement, stating: "This is due to existing soil conditions as confirmed by our testing laboratory as well as the test data provided by your firm." App. 52.

**Response**: Disagrees with the assertion that the contract did not require over excavation and that the contracting officer's decision to enforce the contractual requirement was based solely upon the results of the soil testing, but agrees that the quoted language is accurate.

38. By a letter dated April 25, 2002, Record Steel submitted a certified claim to the contracting officer, seeking $137,714 for additional costs allegedly incurred during the performance of Task Order #1 because of the over excavation. App. 54-67.

**Response**: Agrees.

39. On September 16, 2002, the contracting officer sent a letter to Record Steel, setting forth the facts of the claim and inviting Record Steel to make any suggested corrections or additions to those facts. App. 68-69.

**Response**: Agrees.

40. The contracting officer denied Record Steel's claim in a final decision dated November 7, 2002 (the "Final Decision"). App. 70-72; Compl. ¶ 14.

**Response**: Agrees.

41. Record Steel received the contracting officer's Final Decision on November 12, 2002. App. 70.

**Response**: Agrees.

42. The government issue its contractor "Performance Evaluation" pursuant to the contract on December 9, 2002. Plaintiff's App. 45-48.

**Response**: Agrees that on December 9, 2002, the Government issued a "Performance Evaluation" of Record Steel's performance.

43. Record responded to the government's Performance Evaluation on January 7, 2003, and requested its marginal scores be re-evaluated and changed to accurately reflect its performance. Plaintiff's App. 49-50.

**Response**: Agrees that on January 7, 2003, Record Steel responded to the above referenced "Performance Evaluation" and requested that its marginal scores be changed.

43. Record believes that the substance of the government's Performance Evaluation is related to the dispute concerning over excavation. Plaintiff's App 49; Compl. ¶¶ 20-21.

**Response:** Disagrees, because the Government is presently in no position to confirm or deny Record Steel's subjective beliefs and because Record Steel's subjective belief is not supported by the record. Moreover, the majority of the marginal scores had no connection to over excavation, and Record Steel received an overall satisfactory score for its performance.

44. The government denied the requested re-evaluation on February 10, 2003. Plaintiff's App. 51.

**Response**: Agrees that on February 10, 2003, the Government set a letter to Record Steel stating, in pertinent part that:

After review of your letter and the evaluation form, we have determined that no changes will be made to the original performance evaluation. While your firm believes that the Marginal ratings assigned by this office were "unfair", the ratings were discussed and reviewed by all the staff members involved in this project and reflect our honest opinion of the conditions on the job. Please remember that although some elements of the evaluation rated RSCI's [Record Steel] performance as Marginal, the Overall rating was still a Satisfactory.

Pl. App. 51.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Robert E. Kirschman, Jr.
ROBERT E. KIRSCHMAN, JR.
Assistant Director

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 307-1011
Steven.Mager@usdoj.gov

July 23, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 23rd day of July, 2004, a copy of the foregoing "Response to Plaintiff's Proposed Findings of Unconverted Fact" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice