# In the United States Court of Federal Claims

No. 03-2274C

(Filed October 19, 2004)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | ) | |
| | ) | Contract Disputes Act; |
| **RECORD STEEL AND** | ) | motion to dismiss for lack of |
| **CONSTRUCTION, INC.,** | ) | subject matter jurisdiction; |
| | ) | RCFC 12(b)(1); cross-motions |
| Plaintiff, | ) | for partial summary judgment; |
| v. | ) | contract interpretation; latent |
| | ) | ambiguity versus patent |
| **THE UNITED STATES,** | ) | ambiguity; *contra proferentem*; |
| | ) | juridical power to review |
| Defendant. | ) | negative performance evaluation |
| | ) | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

John Spencer Stewart, Stewart Sokol & Gray, LLC, Portland, OR, for plaintiff. Of counsel was Robert B. Coleman.

Steven M. Mager, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the brief were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, and Robert E. Kirschman, Jr., Assistant Director, Commercial Litigation Branch.

## OPINION AND ORDER

LETTOW, Judge.

This contract case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and for partial summary judgment pursuant to RCFC 56, along with plaintiff's cross-motion for partial summary judgment. Plaintiff, Record Steel and Construction, Inc. ("Record Steel"), is an Idaho corporation seeking to recover additional costs it allegedly incurred in connection with its performance of a design-build contract pursuant to which it designed and

constructed a dormitory at Offutt Air Force Base in Bellevue, Nebraska. Record Steel brings this action pursuant to the Contract Disputes Act[1] based on a claim for equitable adjustment in an amount not less than $188,380. Record Steel avers that it was subject to a constructive change or incurred extra work due to a directive of the United States Army Corps of Engineers ("Corps of Engineers") requiring over-excavation and placement of re-compacted fill to support the dormitory's foundation. In addition to money damages, Record Steel seeks a declaratory judgment that a performance evaluation issued after completion of Record Steel's work be corrected to reflect accurately Record Steel's performance under that contract.

The crux of the parties' dispute is whether the contract at issue required over-excavation. Record Steel interprets the contract to provide unambiguously that over-excavation was a design recommendation rather than a design requirement. In the alternative, Record Steel maintains that the contract was ambiguous respecting whether over-excavation was required, that the ambiguity was latent, and that it should therefore be construed against the government. By contrast, the government argues that the contract expressly and unambiguously required Record Steel to over-excavate the foundation. Additionally, the government contends that this court does not possess jurisdiction over claims for declaratory relief and that Record Steel's claim seeking a corrected performance evaluation must therefore be dismissed. The parties have fully briefed their positions, and a hearing was held on August 30, 2004. For the reasons that follow, the government's motion for summary judgment is denied, Record Steel's cross-motion for partial summary judgment as to liability is granted in part and denied in part, and the government's motion to dismiss is denied.

**BACKGROUND**[2]

On October 15, 1999, the Corps of Engineers issued a solicitation for a "Design/Build Multiple Award Task Order Contract (MATOC) for Construction Services Primarily on Air Force Bases in the states of Washington, Oregon, Idaho, Montana, Wyoming, Colorado, North Dakota, South Dakota, Nebraska, Minnesota, Kansas, Missouri, Iowa, and Wisconsin." PFUF

---

[1]The Contract Disputes Act of 1978 ("CDA"), as amended, is codified at 41 U.S.C. §§ 601-613.

[2]The facts set out below do not constitute findings of fact by the court but rather are presented only to provide a basis for analysis of the parties' positions. These facts are drawn mainly from documents contained in an appendix ("App.") to Defendant's Motion for Partial Summary Judgment and to Dismiss ("Def.'s Mot.") and from Plaintiff's Proposed Findings of Uncontroverted Fact ("PFUF"), insofar as the government has adopted them. *See* Def.'s Resp. to Pl.'s Proposed Findings. In addition, the court has adopted certain factual recitations from the Complaint ("Compl.") and from documents contained in an appendix ("Pl.'s App.") to Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment and to Dismiss and Plaintiff's Cross-Motion for Partial Summary Judgment ("Pl.'s Cross-Mot."), where it was evident that such recitations were not disputed.

¶ 1; App. 1. In the following month, Record Steel submitted a proposal in response to that solicitation. PFUF ¶ 2; App. 2. On February 16, 2000, the government awarded Record Steel an indefinite-delivery, indefinite-quantity contract pursuant to the MATOC. PFUF ¶¶ 3-4; App. 2. Thereafter, on June 9, 2000, the Corps of Engineers awarded Task Order No. 1 under that contract to Record Steel, which task order involved the design and construction of a dormitory at Offutt Air Force Base at a basic award price of $8,799,428. PFUF ¶¶ 5-6; Compl. ¶ 4.

The steps leading up to the award of Task Order No. 1 engendered the contractual language that divides the parties. A Request for Proposals ("RFP") was issued that provides in Section 01005, "Structural Requirements," subparagraph 1.7.1, "Design Parameters," in pertinent part: "Parameters used for foundation design, including overexcavation and compaction requirements . . . shall be in accordance with the Final Foundation Analysis report provided." PFUF ¶¶ 8-10; App. 12. That report was attached to the RFP, where it is labeled "Foundation Analysis Report" ("Report"). PFUF ¶ 11; App. 15. In a section entitled "Subsurface Recommendations," the Report states in part:

> An analysis of undisturbed sample test data indicated that settlement governs the allowable bearing pressure of footings at this site. The settlement analysis predicted a footing movement greater than two inches with a nominal 2000 psf excess soil load on in situ material. Due to the anticipated column loads for a multi-story building, it is believed that improving the site is more viable than reducing the bearing pressure to a very low value. . . . The recommended improvement program is outlined below.
>
> . . .
>
> (b) Four (4) feet of material should be excavated from below the bottom elevation of all building footings.
>
> (c) Over excavation and replacement should extend a distance of at least four (4) feet beyond the outer edge of footings.

PFUF ¶ 12; App. 19-20. As the Report further explained, "[b]ased on consolidation testing, Standard Penetration Test results and experience with engineered fill, total settlement is not expected to exceed 1-inch if the over excavation and replacement program outlined above is followed. Differential settlement is not expected to exceed 0.5 inch." PFUF ¶ 13; App. 21. Finally, the RFP specified that "[t]he criteria specified in this RFP are binding . . . and in case of any conflict, after award, between the RFP criteria and Contractor's submittals, the RFP criteria will govern unless there is a written and signed agreement between the Contracting Officer and the Contractor waiving a specific requirement." PFUF ¶ 17; App. 29.

In response to the RFP, Record Steel submitted its price proposal by letter dated January 14, 2000. PFUF ¶ 19; App. 43. In that letter, Record Steel stated that it "understand[s] that in

the case of any conflicts after contract award between the requirements stated in the RFP and our proposal, the RFP shall govern." PFUF ¶ 20; App. 43. However, in the same letter plaintiff also informed the Corps of Engineers:

> We would like to note that the borings taken for this project do not cover the area on the northern site and intend to incorporate new borings into our design if awarded this project. We feel confident that over excavation for foundations will not be required. Should over excavation for the building foundations be required [Record Steel] will perform this work at no additional cost to the Government.

PFUF ¶ 21; App. 43. Subsequently, in response to the Request for Final Revised Proposals issued by the contracting officer, Record Steel submitted a revised proposal dated March 12, 2000, in which Record Steel repeated the two statements just quoted. PFUF ¶¶ 22-24; App. 44.

On June 9, 2000, the date on which Record Steel was awarded Task Order No. 1, the contracting officer held a pre-design meeting with Record Steel. PFUF ¶ 25; App. 70. Prior to that meeting, Record Steel had employed a geotechnical firm, Great Plains Testing Laboratories ("Great Plains"), which concluded that over-excavation would not be required as a matter of sound engineering design. PFUF ¶ 27; App. 54. At the pre-design meeting, the parties discussed whether over-excavation would be necessary, and they agreed that Record Steel would again retain Great Plains to conduct a field investigation of the site and provide further information to both Record Steel and the Corps of Engineers demonstrating whether or not over-excavation would be necessary. PFUF ¶ 27; App. 54. If the resulting data were deemed satisfactory, then Record Steel would proceed with its design without conducting over-excavation. PFUF ¶ 27; App. 54.

Great Plains conducted its independent site investigation under the direction of John Christiansen, a professional engineer registered in Nebraska. PFUF ¶ 28; App. 54. On August 23, 2000, Great Plains submitted Mr. Christiansen's report, which concluded that the site was suitable for use of native soil beneath the footings without over-excavation. PFUF ¶¶ 28-29; Pl.'s App. 1-34, 8; App. 54, 71. On September 22, 2000, Record Steel was given a limited Notice to Proceed regarding clearing, grubbing, and grading, and this work commenced on September 25, 2000. App. 54.

In the course of his design review, the contracting officer raised the issue of an apparent discrepancy between the language in the RFP respecting the necessity of over-excavation and that in the Great Plains report. PFUF ¶ 30; App. 54, 71. The parties again discussed the issue at a design review meeting held on October 3, 2000, and they agreed that Great Plains would conduct nuclear density testing of the native soil at the actual footing depth. PFUF ¶ 33; App. 54-55, 71. A few days later, both the Corps of Engineers and Great Plains took samples for concurrent testing. PFUF ¶ 34; App. 55, 71.

On October 10, 2000, Great Plains reported that its tests confirmed that the native soils were not susceptible to collapse and were adequate to accept the building's footings. PFUF ¶ 35; App. 55, 71. However, in a letter dated October 19, 2000, the contracting officer's representative informed Record Steel that "[y]our firm will not be issued notice to proceed for the footings on this project until your firm complies will [sic] the requirements of the subsurface recommendations of the Foundation Analysis Report." PFUF ¶ 36; App. 52. That letter explained: "This is due to the existing soil conditions confirmed by our testing laboratory as well as the test data provided by your firm." PFUF ¶ 37; App. 52. In addition, the density requirement was reduced from 95% to 92% of maximum modified density. App. 52. Record Steel then began to conform to the direction to over-excavate by removing the form work that had been installed, moving all control points outside of over-excavation limits, and over-excavating foundation soil. App. 55. Finally, by a letter dated October 23, 2000, the contracting officer's representative gave Record Steel permission to use the over-excavated soil as backfill. App. 53.

After the construction project was completed, on April 25, 2002 Record Steel submitted a certified claim to the contracting officer, seeking $137,714 for additional costs allegedly incurred during its performance. PFUF ¶ 38; App. 54-67. On September 16, 2002, the contracting officer sent Record Steel his proposed findings of fact and invited Record Steel to submit written comments. PFUF ¶ 39; App. 68-69. The contracting officer issued a final decision denying Record Steel's claim on November 7, 2002. PFUF ¶ 40; App. 70-72. In his final decision, the contracting officer reasoned that the RFP made over-excavation a requirement and that, notwithstanding the government's good faith consideration of Record Steel's alternate proposal, the government ultimately neither accepted that proposal nor modified the RFP. App. 71-72.

The government subsequently issued its performance evaluation pursuant to Record Steel's contract on December 9, 2002, giving Record Steel an overall "Satisfactory" rating, but incorporating elements that were scored as "Marginal." Pl.'s App. 51; PFUF ¶ 42, 44; *see also* Pl.'s App. 45-48.

In its response dated January 7, 2003, Record Steel requested that its marginal scores be reevaluated and corrected to represent its performance accurately. PFUF ¶ 43; Pl.'s App. 49-50. The government denied that request on February 10, 2003. Pl.'s App. 51.

Record Steel filed its complaint in this court on October 2, 2003.

## STANDARDS FOR DECISION

### A. *Summary Judgment*

A court may grant summary judgment if the record demonstrates there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is "genuine" if it "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at

250. A fact is "material" if it would affect the outcome of a case. *Id.* at 248. When deciding these issues, a court must resolve all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

When considering cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the moving party. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Denial of both motions is warranted if genuine disputes exist over material facts. *Id.* at 1391.

B. *Motion to Dismiss*

The jurisdiction of a federal court must be established as a threshold matter before the court may entertain the merits of an action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). The subject matter jurisdiction of the Court of Federal Claims is "prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998). That waiver "'cannot be implied but must be unequivocally expressed.'" *Saraco v. United States*, 61 F.3d 863, 864 (Fed. Cir. 1995) (quoting *United States v. King*, 395 U.S. 1, 4 (1969)). In this case, Record Steel points to the Tucker Act as the United States' expression of its waiver of sovereign immunity respecting plaintiff's claims.[3]

---

[3]Specifically, with respect to its claims for an equitable adjustment and for declaratory relief, Record Steel relies on the provision of the Tucker Act vesting jurisdiction in this court "to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978." 28 U.S.C. § 1491(a)(2). Section 10(a)(1) of the CDA is codified at 41 U.S.C. § 609(a)(1) and provides that, after a claim has been presented to a contracting officer and has been denied or has neither been granted nor denied in a timely fashion, "a contractor may bring an action directly on the claim in the United States Court of Federal Claims."

As an alternative basis for the court's jurisdiction over its claim for a declaratory judgment, Record Steel invokes the following portion of the Tucker Act:

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

The plaintiff bears the burden of establishing a court's subject matter jurisdiction. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). In considering a challenge to its jurisdiction, a court assumes as true all well-pleaded facts alleged in the complaint and construes those facts in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled in part on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000). When the underlying facts alleged to establish jurisdiction are at issue, a court may examine evidence outside the face of the pleadings to resolve its jurisdiction. *McNutt*, 298 U.S. at 189; *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993).

## ANALYSIS

### A. *Whether the Contract Is Ambiguous*

Preliminarily, the court must address whether the contract is susceptible to only one interpretation respecting the over-excavation term or lends itself to more than one interpretation and is therefore ambiguous. "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.'" *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (quoting *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)). Each party in the instant case maintains that the contract is not ambiguous because its respective reading is the only one supported by the plain language and that the other party's reading falls outside the zone of reasonableness.

Interpretation of a contract begins with the text of the instrument. *NVT Techs.*, 370 F.3d at 1159 (citation omitted). If the language is explicit and unambiguous, the court must give effect to its plain meaning and may not refer to extrinsic evidence as an interpretive guide. *L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296, 307-08 (2004) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988)); *cf. HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004) ("In light of the ambiguity and the arguments made by the parties, the Board properly received evidence of trade practice and custom in an attempt to resolve the ambiguity.") (citations omitted). In addition, the writing must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its provisions. *NVT Techs.*, 370 F.3d at 1159 (citation omitted). Thus, an interpretation that gives meaning to all portions of the contract is favored over one that leaves a part of the contract meaningless. *Id.*

---

28 U.S.C. § 1491(a)(2).

In this contract, the "Design Parameters" subparagraph of the section captioned "Structural Requirements" in the RFP provides: "Parameters used for foundation design, including overexcavation and compaction requirements, the allowable soil bearing pressure, lateral earth pressure coefficients and design footing depths *shall* be in accordance with the Final Foundation Analysis report provided." App. 12 (emphasis added). "Shall" is ordinarily used as a verb connoting a command or requirement. *See Southern California Edison v. United States*, 58 Fed. Cl. 313, 322 (2003) (quoting *Black's Law Dictionary* 1233 (5th ed. 1979)). The question thus becomes whether the contractor's design could be "in accordance with" the Report without actually including over-excavation. Consequently, interpretation of the contract in this case necessitates a close reading of the Report.

In the Report, Section 1.14.1, "Spread Footings on Engineered Fill," of the part entitled "Subsurface Recommendations," stated:

> An analysis of undisturbed sample test data indicated that settlement governs the allowable bearing pressure of footings at this site. The settlement analysis predicted a footing movement greater than two inches with a nominal 2000 psf excess soil load on in situ material. Due to the anticipated column loads for a multi-story building, *it is believed that improving the site is more viable than reducing the bearing pressure* to a very low value. Analysis utilizing replacement of a portion of the subgrade with engineered fill yielded acceptable movement, on the order of one inch, when four feet of in situ soil was replaced with compacted select material. The *recommended improvement program* is outlined below.
>
> (a) An *allowable bearing pressure of 2000 psf in excess of that due to the existing soil column should be used for design*. Any load caused by fill added to the site above the current ground elevation should be subtracted from the bearing pressure.
> (b) *Four (4) feet of material should be excavated* from below the bottom elevation of all building footings.
> (c) *Over excavation and replacement should extend* a distance of at least four (4) feet beyond the outer edge of footings.
> (d) *The exposed surface should be scarified*, moisture conditioned, *and recompacted* to a density of not less than 95% of maximum Modified density for a depth of 12 inches.
> (e) *The over excavation depth should be backfilled* with moisture conditioned select material meeting the following specification at a density of not less than 95% of maximum Modified density. Loose lift thickness of backfill should not exceed 12 inches.

> *Select material shall be defined as natural sand and gravel, crushed rock, manufactured sand, or quarry fines. The material shall have a maximum particle size of one inch (25.4 mm) and a percent passing the No. 200 sieve of not less than 15 percent nor more than 49 percent. The portion of material passing the No. 40 sieve shall either be non-plastic or shall have a plasticity index of less than or equal to 12.*
>
> (f) *Exposed subgrades should be backfilled* in a timely manner and protected from excessive moisture loss or gain. In no instances *should* water be allowed to pond on or saturate the subgrade during construction. Footings *should* be placed and the area backfilled as soon as possible in order to protect the select backfill from moisture content change.
>
> (g) Backfill above footing level and adjacent to subsurface building walls does not need to consist of select material; native soils meeting the definition of suitable material for buildings *may* be used.
>
> (h) Floor slabs *should* have a minimum of eighteen inches of compacted select material below the capillary water barrier layer.

App. 19-20 (emphasis added except emphasis in original between items (e) and (f)). The Report further explained that "[b]ased on consolidation testing, Standard Penetration Test results and experience with engineered fill, total settlement is not expected to exceed 1-inch if the over excavation and replacement program outlined above is followed." App. 21 (Section 1.18). The Report thus uses the verb "shall" only in the text placed between quoted items (e) and (f). In other respects the Report uses the precatory verb "should" along with the phrase "it is believed," or, on one occasion, the permissive verb "may."

Record Steel's reading of these provisions is that because the Report merely recommends, but does not require, over-excavation, the incorporation of those recommendations into the RFP does not convert those recommendations into requirements. Rather, the RFP's use of the word "requirements" with reference to the Report means that if Record Steel were to include over-excavation as a component of its design, then any such requirements Record Steel establishes must be "in accordance with" the Report. The court finds that this interpretation falls within the zone of reasonableness for several reasons.

First, the RFP emphasizes that design of the project was the responsibility of the contractor, so long as the design accorded with the criteria set forth in the RFP and the Report. In a section entitled "Project Description and Requirements," the RFP stated: "The dormitory building will be a multi-story structure designed by the Contractor in accordance with the structural engineering criteria stated herein." App. 6 (Subparagraph 1.1). Further, Subparagraph 1.7, the "Foundation System and Design" section of the RFP, specified that "[d]esign of foundation components shall be the responsibility of the contractor." App. 11. In other words,

the contractor was expected to exercise its professional judgment in designing the dormitory and in that connection had to defer only to specific requirements contained in the RFP and Report.

Second, in the Report, seven of the eight subparagraphs comprising the "recommended improvement program" set out in Section 1.14.1 continually use the word "should." The only provisions deviating from that language are subparagraph (g), which uses "does not need" and "may," and more importantly, the italicized text between subparagraphs (e) and (f), which uses "shall" several times. The use of the word "shall" to define and describe the nature and size of the "select material" used for backfill suggests that the use of "should" in other subparagraphs is not intended to convey a mandatory command. Ordinarily, "should" is used as a precatory verb, and it appears from the context that no deviation from standard usage was intended. *See Black's Law Dictionary* 1195 (7th ed. 1999) (defining "precatory" as a word "requesting, recommending, or expressing a desire for action, but usually in a nonbinding way").

That the Report does not use "should" in the same sense as "shall" is confirmed by the equivocal and non-mandatory language contained in Section 1.14.1. There, the drafters of the Report explain that they "believed" that over-excavation is "more viable" because its "settlement analysis predicted" more than two inches of footing movement given the "anticipated column loads" for a building not yet designed. App. 19 (quoted in full *supra*, at 8-9). Accordingly, the Report provides a "recommended improvement program" outlining what steps "should" be taken. In contrast, other sections of the Report require elements of design by using "shall" without using equivocal language. *See* App. 20 (Section 1.15: "A vapor barrier overlying a six-inch capillary water barrier shall be required beneath all floor slabs on grade."); App. 20 (Section 1.16: "[L]ateral earth pressures on basement or retaining walls above the water table shall be calculated. . . . Lateral earth pressures below the water table shall be calculated. . . . An in situ soil dry density of 110 pcf shall be used for design purposes."); App. 20-21 (Section 1.17: "If rigid pavement design does not consider frost penetration, a modulus of subgrade reaction "K" of 150 pci shall be used for design purposes. Flexible pavement designs shall use. . . . If frost penetration is considered in the design of rigid or flexible pavements, the design shall be in accordance with . . . ."); App. 21 (Section 1.19: "sulfate-resistant cement will not be required . . . ." and "all concrete specifications shall include" another option); *see also* App. 21 (Section 1.21: containing the imperatives "maintain," "exit," "provide," and "avoid"). Finally, the use of "shall" to describe the nature and size of the select material for backfill in Section 1.14.1 does not necessarily mean that use of such material was a requirement. Rather, it is reasonable to read this provision in the context of Section 1.18 and the preamble to Section 1.14.1. As the former section opines, "total settlement is not expected to exceed 1-inch *if* the over excavation and replacement program outlined above is followed." App. 21 (emphasis added). In other words, if the contractor were to follow the Report's recommendation "that improving the site is more viable than reducing the bearing pressure," then the contractor must use the select material described for backfill. App. 19 (Section 1.14.1).

The reasonableness of Record Steel's interpretation is further evident in the fact that, as both parties agree, the government's initial borings were not conducted within the actual

footprint of the dormitory's location. *See* Joint Resp. to Court's Order of August 30, 2004. In response to a request by the court made at the hearing on the cross-motions in this case, the parties submitted a joint supplemental filing that included a site plan drawing and that addressed the issues of whether the borings that provide the basis for the Report's conclusions were taken from the actual footprint of the dormitory site, or, if not, where they were taken in relation to that site. The parties reached agreement on the former issue, but not on the latter. Specifically, Record Steel's view is that "the borings taken by the Government and by Great Plains Testing Laboratories are at two different sites, and that no borings were made by the Government at or even near the site upon which the dormitory was actually constructed." *Id.* By contrast, the government's position is that "the two proposed dormitory locations are actually right next to each other at the same site, and that [Record Steel] was able to choose where it was going to place/construct the building within the site." *Id.* In all events, the fact that the government's borings were not taken from the actual building site supports the reasonableness of Record Steel's position that the contract did not require over-excavation. As Record Steel informed the government by letters dated January 14, 2000 and March 12, 2000, "[w]e would like to note that the borings taken for this project do not cover the area on the northern site and intend to incorporate new borings into our design if awarded this project. We feel confident that over excavation for foundations will not be required." App. 43, 44. Moreover, this view is reflected in an affidavit of the project engineer for the dormitory, submitted by Record Steel, who explains that "the fact that the borings upon which the government's geotechnical report relied were not within the building's actual footprint indicated to me that the geotechnical engineer intended to convey to the designer that additional geotechnical investigation not only was appropriate but also was required." Aff. of Robert V. Stevens, P.E. ¶ 4 (June 7, 2004).

The court further concludes that the government's interpretation of the contract also falls within the zone of reasonableness. The government's view is that by using the verb "shall" in connection with incorporating the Report's recommendations, and also by referring to "overexcavation and compaction requirements," the RFP expressly converts the Report's recommendations into requirements. App. 12 (Section 1.7.1). In support of its reading, the government points to language in the RFP giving the contractor some discretion. *See* App. 6 (Subparagraph 1.1: "it is preferred that walls between the two bedrooms within a unit, and the wall along one side of the corridor be non-structural partitions which can be removed to provide more open floor space."); App. 8 (Subparagraph 1.4: "Materials selection shall be at the Contractor's discretion, with the following limitation: pre-engineered metal buildings, standing seam metal roof systems, wood products, and open web steel joists are not acceptable for the structural framing system."); App. 13 (Subparagraph 1.8.5: "Slab finishes in other portions of the building shall be left to the discretion of the contractor, subject to the approval of the Contracting Officer."). By contrast, the provision discussing over-excavation did not state that over-excavation is merely "preferred" or left to the contractor's discretion. Instead, the RFP refers to over-excavation as a "requirement" that "shall be in accordance with the Final Foundation Analysis report." App. 12. It is reasonable to read this language as denying the contractor the discretion to decide not to over-excavate.

In short, the court determines that both parties' interpretations of the contract are reasonable and that the contract is therefore ambiguous. The resulting issue is whether that ambiguity is patent and should be resolved against Record Steel.

B. *Whether the Ambiguity is Patent or Latent*

The general rule for choosing between competing interpretations of ambiguous contract language is *contra proferentem*, which requires that ambiguities be construed against the drafter. *See HPI/GSA-3C*, 364 F.3d at 1334. The "essential ingredients of the rule" of *contra proferentem* are:

> (1) that the contract specifications were drawn by the Government; (2) that language was used therein which is susceptible of more than one interpretation; (3) that the intention of the parties does not otherwise appear; and (4) that the contractor *actually and reasonably construed the specifications* in accordance with one of the meanings of which the language was susceptible.

*Id.* at 1334-35 (quoting *Western Contracting Corp. v. United States*, 144 Ct. Cl. 318, 326 (1958)).

The exception to that general rule is the patent ambiguity doctrine, which mandates resolving ambiguities against the contractor where the ambiguities are "'so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them.'" *Id.* (quoting *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997)). The Federal Circuit "has not given the [patent ambiguity] doctrine broad application . . . [b]ecause the doctrine has the effect of relieving the government from the consequences of its own poorly drafted contracts." *Triax*, 130 F.3d at 1475. An ambiguity that is not so glaring as to trigger the patent ambiguity exception is considered latent, and the *contra proferentem* rule applies. *HPI/GSA-3C*, 364 F.3d at 1334 (citing *Triax*, 130 F.3d at 1475).

The ambiguity in the contract between Record Steel and the government is neither glaring nor obvious. Indeed, it appears from the record that the government did not explicitly raise its competing interpretation of the contract until the briefing of the pending dispositive motions. Previously, its actions in implementing the contract left uncertain the government's position on contractual interpretation. Even as late as October 19, 2000, at a critical juncture, the contracting officer's representative informed Record Steel that "[y]our firm will not be issued notice to proceed for the footings on this project until your firm complies will [sic] the requirements of the subsurface recommendations of the Foundation Analysis Report." PFUF ¶ 36; App. 52. The meaning of the phrase "the *requirements* of the subsurface *recommendations*" poses its own problems and cannot have clarified the government's posture. Moreover, the contracting officer's representative seems to have based his decision on engineering principles rather than on

contract interpretation: "This is due to the existing soil conditions confirmed by our testing laboratory as well as the test data provided by your firm." PFUF ¶ 37; App. 52.

In short, Record Steel has satisfied the four elements of the *contra proferentem* rule. First, there is no dispute that the government drew the contract specifications. Second, the language respecting the over-excavation term is ambiguous. *See supra*, at 9-12. Third, there has been no suggestion that the parties' intentions appear elsewhere in the record. Fourth, Record Steel actually relied on its interpretation when submitting its price proposal on January 14, 2000, and its revised proposal dated March 12, 2000, responding to the government's Request for Final Revised Proposals. *See supra*, at 11. In addition, Record Steel's reading of the contract was reasonable. *See supra*, at 9-11. Consequently, the ambiguity in the contract provisions regarding over-excavation must be construed against the government.

### C. *Partial Summary Judgment*

"[C]ontract interpretation is a matter of law," *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992); *see also HPI/GSA-3C*, 364 F.3d at 1333, and thus issues of contract interpretation can be readily susceptible of resolution via summary judgment. *NVT Techs.*, 370 F.3d at 1159; *L.W. Matteson*, 61 Fed. Cl. at 307 (citing *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988)). Here, there is no genuine issue of material fact that precludes summary disposition of the issues of contract interpretation.

Record Steel is therefore entitled to a summary judgment that the contract between Record Steel and the government did not require over-excavation to be performed and that the government erred in construing the contract to provide that it did so require. Thus, the government's motion for partial summary judgment is denied, and plaintiff's cross-motion for partial summary judgment is granted in part. In light of the court's disposition of the cross-motions based upon the contractual language, the court does not now reach the question whether over-excavation was required as a matter of sound engineering, *see* Pl.'s Cross-Mot. at 11 & n.2, 14 & n.3, or whether, and to what extent, the government is liable for any additional costs Record Steel may have incurred. Those issues are remitted to further proceedings in this case.

### D. *Jurisdiction over Record Steel's Claim for Nonmonetary Relief*

Record Steel's request for this court's review and correction of the somewhat adverse performance evaluation prepared by the contracting officer's representative under the contract raises jurisdictional issues. The last sentence of Paragraph (a)(2) of the Tucker Act provides that this court's jurisdiction extends to "any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act[, 41 U.S.C. § 609(a)(1)]." 28 U.S.C. § 1491(a)(2). The final clause of this same sentence was added by an amendment enacted in 1992 and specifies that this jurisdiction includes "other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act [, *i.e.,* the Contract

Disputes Act, 41 U.S.C. § 605]." *Id.*[4] The word "claim" is not defined in the Contract Disputes Act, but the Federal Acquisition Regulations ("FAR") define that term as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." FAR [48 C.F.R.] § 52.233-1(c).[5]

The government argues that Record Steel's request for declaratory relief does not constitute a valid claim under the CDA because Record Steel's letter did not seek that relief "as a matter of right," nor does the relief "aris[e] from or relat[e] to this contract." Def.'s Reply at 10. In particular, the government contends that Record Steel did not have a contractual right to specific performance evaluation scores, nor did it assert such a right in its letter to the contracting officer's representative. *Id.* at 10-11.

In *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260 (Fed. Cir. 1999), the Court of Appeals explained that the phrase "as a matter of right" "requires only that the contractor specifically assert entitlement to the relief sought. That is, the claim must be a demand for something due or believed to be due rather than, for example, a cost proposal for work the government later decides it would like performed." *Id.* at 1265. *See generally Tiger Natural Gas, Inc. v. United States*, 61 Fed. Cl. 287, 292-93 (2004) (discussing the 1992 amendments to 28 U.S.C. § 1491(a)(2) and *Alliant*). In *Alliant*, the Court of Appeals further noted that the contractor "asserted specific contractual and legal grounds for its interpretation of the option and by doing so met that requirement," 178 F.3d at 1265, but in so noting, the court was only explicating the facts before it. The Federal Circuit did not hold that contractors must make explicit legal arguments in their letters to the contracting officer requesting non-monetary relief; rather, the phrase "as a matter of right" in the FAR modifies the word "seeking."

---

[4]*See* Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 907(b), 106 Stat. 4506, 4519. With that amendment, the third sentence of 28 U.S.C. § 1491(a)(2) now reads:

> The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

28 U.S.C. § 1491(a)(2).

[5]The Federal Acquisition Regulations are codified in title 48 of the Code of Federal Regulations ("C.F.R.").

Record Steel's letter to the contracting officer's representative dated January 7, 2003 constitutes a claim. In that letter, Record Steel "request[ed] that the marginal ratings be reevaluated and changed based on the information provided and that this document be added as a permanent attachment to the evaluation." Pl.'s App. 50. By doing so, Record Steel was seeking relief relating to the contract pursuant to a claim of right. Specifically, under the FAR, a contracting agency is required to prepare performance evaluations for each construction contract of at least $500,000. FAR § 36.201(a)(1). *See generally J.C.N. Constr. Co. v. United States*, 60 Fed. Cl. 400, 408, 410 (2004) (addressing the regulations pertinent to contractor performance evaluations). In addition, agencies or other entities within the Department of Defense are required to submit each such contractor performance evaluation to a central database, known as the Construction Contractor Appraisal Support System ("CCASS"). *See* Department of Defense Federal Acquisition Regulation Supplement ("DFARS") [48 C.F.R.] § 236.201(a), (c). Contractors are able to confirm that evaluations had been submitted to the CCASS database and to obtain copies of their evaluations. *See J.C.N. Constr.*, 60 Fed. Cl. at 410 (discussing information provided on the Corps of Engineers' website about the CCASS).

The Corps of Engineers, in carrying out these evaluative functions respecting the contract at issue in this case, prepared an evaluation of Record Steel's performance and sent it to Record Steel on December 9, 2002. Pl.'s App. 45. The transmittal by the Corps' representative implicitly but not explicitly sought comments. *Id*. ("If you choose to respond to this evaluation, your comments will be made a part of the official record."). Record Steel's president responded on January 3, 2003, expressing disagreement with the evaluation and requesting revisions. Pl.'s App. 49-50.). The denial of Record Steel's request by the contracting officer's representative, sent by letter dated February 10, 2003, Pl.'s App. 51, meant that the agency had issued its final agency action. In that letter, the contracting officer's representative stated that "we have determined that no changes will be made to the original performance evaluation." *Id*. Although the letter does not specify that it is a final decision, "[a] letter can be a final decision under the CDA even if it lacks the standard language announcing that it constitutes a final decision." *Alliant*, 178 F.3d at 1267 (citing *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990)). Record Steel had sought reconsideration of the Corps' evaluation of performance under the contract, and the contracting officer's representative had denied reconsideration, rendering the evaluation a final action.[6]

---

[6]It is not material that the contracting officer's representative, rather than the contracting officer himself, issued the final decision, nor has the government suggested as much. To fulfill its duty for purposes of the CDA's claims process, a contractor need only submit a claim to its regular contact within the agency and request a final decision. The government then bears the responsibility properly to process the claim. *See United Partition Sys., Inc. v. United States*, 59 Fed. Cl. 627, 637-38 (citing *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880 (Fed. Cir. 1991), *overruled in part on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1579 (Fed. Cir. 1995) (en banc); *D.L. Braughler Co. v. West*, 127 F.3d 1476, 1481-82 (Fed. Cir. 1997)).

Final action by a federal agency, whether taken on a formal or an informal basis, ordinarily is reviewable in a federal district court under its general federal-question jurisdiction, 28 U.S.C. § 1331, and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(D). *See Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 584-85 (1980) (review of "other final action" taken through an exchange of correspondence); *cf. National Org. of Veterans' Advocates, Inc. v. Secretary of Veterans Affairs*, 330 F.3d 1345, 1347 (Fed. Cir. 2003) (preenforcement review of an agency's informal rulemaking action). However, as *Harrison* indicates, Congress may provide a specific alternative jurisdictional route for review of particular actions. That other route may either be exclusive, displacing the generally provided means of review in a federal district court, *see Harrison*, 446 U.S. at 587-94, or it may be a permissive alternative that adds an optional forum. In this instance, the last sentence of 28 U.S.C. § 1491(a)(2) provides a permissive alternative jurisdiction in this court to address claims for nonmonetary relief under the Contract Disputes Act that also happen to constitute claims for review of final agency action.

The government makes a further argument that because the boards of contract appeals have declined to exercise jurisdiction over review of contractor performance evaluations, so too should this court. Def.'s Reply at 11-12. For example, the government relies on *Appeal of TLT Construction Corp.*, ASBCA No. 53,769, 02-2 BCA ¶ 31,969 (Aug. 26, 2002), in which an administrative judge reasoned that review of such evaluations should be declined because (1) performance evaluations are administrative matters that do not arise out of a contract or regulation, and (2) a board lacks authority to issue injunctive relief. *Id.* The ASBCA's decision in *TLT Construction* is not persuasive insofar as this court's jurisdiction is concerned. The court disagrees with the first ground of the board's decision in *TLT Construction* because, as explained above, the FAR and the DFARS relating to evaluations of construction contracts performed for entities within the Department of Defense impose an obligation on the contracting governmental entity both to complete an evaluation and to provide a copy of that evaluation to the contractor along with an opportunity to comment. *See J.C.N. Constr.*, 60 Fed. Cl. at 407-10. Second, without opining on the equitable jurisdiction of an agency board, this court has an explicit grant of jurisdiction in the Tucker Act to issue injunctive and declaratory relief in specified areas, and particularly the court "may, as an incident of and collateral to any such judgment [, *i.e.*, one rendered under Subsection (a) of the Tucker Act], issue orders directing "correction of applicable records" or "remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2). Further, the court finds instructive the Federal Circuit's observation in *Alliant* that:

> Congress has granted relatively free access to the boards of contract appeals and the Court of Federal Claims by authorizing review of final decisions of contracting officers on "any claim" by a contractor, 28 U.S.C. § 1491, and "any appeal [from a contracting officer's decision on a claim] relative to a contract made by [an] agency," 41 U.S.C. § 607(d).

178 F.3d at 1270-71. The court thus holds that 28 U.S.C. § 1491(a)(2) vests this court with jurisdiction to review contractor performance evaluations if the pertinent requirements of the CDA are met.

In short, Record Steel submitted a proper claim under the CDA for nonmonetary relief, a final decision was rendered on that claim, and this court possesses jurisdiction to review that decision.[7]

**CONCLUSION**

For the reasons stated, the government's motion for partial summary judgment and to dismiss for lack of subject matter jurisdiction is denied. Record Steel's cross-motion for partial summary judgment is granted in part and denied in part. Record Steel is entitled to a summary judgment that the contract between Record Steel and the government did not require over-excavation to be performed. The parties are ordered to file a joint status report on or before November 15, 2004, addressing further proceedings in this case in accordance with RCFC Appendix A.

IT IS SO ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[7]In the alternative, Record Steel posits that this court may exercise jurisdiction over the subject matter of this claim pursuant to the first sentence of 28 U.S.C. § 1491(a)(2), which states:

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States.

In light of the court's ruling that the third sentence of 28 U.S.C. § 1492(a)(2) provides jurisdiction over the instant claim, the court does not reach the issue of whether the first sentence also provides a basis for jurisdiction.