# A P P E N D I X

# INDEX TO APPENDIX

**DOCUMENT** **PAGE(S)**

Declaration of Jennifer S. McQueen
(January 23, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RECORD STEEL AND CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2274C (Judge Lettow) |
| THE UNITED STATES | ) | |
| Defendant. | ) | |

**DECLARATION OF JENNIFER S. MCQUEEN.**

I, Jennifer S. McQueen, being first duly sworn, do state under oath that the following information is true and correct to the best of my knowledge and belief.

1. During the performance of Contract No. DACA67-00-D-0202, Delivery Order #1, FY2000 Dormitory, Offutt Air Force Base, Nebraska, by Record Steel and Construction, Inc. ("RSCI"), I served as the Project Engineer for the United States Army Corps of Engineers, Omaha District. In that role, I often was on the job site and able to observe the work of the subcontractors and the management of RSCI. Additionally, I drafted a majority of the correspondence between the Corps of Engineers and Record Steel and Construction, sent under the signature of the Area Engineer.

2. I drafted the performance evaluation based upon my own personal observations and the input of Joel Flere, based on our accumulated contemporary working experiences with Record Steel and Construction, rather than a simple examination of documents. The draft evaluation then was reviewed by Alan Kreisler, the Resident Engineer for the Corps of Engineers at Offutt Air Force Base. Based on established procedures, I then would have discussed the draft evaluation with

Kreisler, answering any questions that he had and working with him to ensure that the evaluation was fair, reasonable, and supported by the factual record. Finally, the draft evaluation was reviewed by the Fort Crook Area Engineer, Steve Schmidt. During this review process, every individual approached the performance evaluation from the standpoint that the evaluation had to be fair and well-supported, especially with regards to the need for the contractor to have been informed or aware of issues and problems during contract performance.

3. The Corps of Engineers gave RSCI a marginal rating on sub-element 17.b., "Adherence to Approved Schedule," because its original project manager, Jason Ostenburger, did not order the required aluminum windows, storefronts, and curtain wall materials prior to his leaving the company. As a result, RSCI had an excessively late delivery of the windows, storefronts, and curtain walls. In a letter dated January 7, 2003, RSCI indicated that it believes that it made every effort to expedite delivery of these materials under the contract at issue. However, RSCI, either as an organization or through its replacement project manager, did not even recognize that these materials still needed to be ordered until after the date that they were required had passed. In fact, the materials were not completely delivered until after the original contract completion date.

4. As such, the failure to order required materials and the subsequent schedule delays were the result of poor management by RSCI. Because it failed to order key building components, and then failed to meet its obligation to minimize the resultant delays through early recognition of the problem and expedited delivery, RSCI also was evaluated to be only marginal at sub-element 17.c., "Resolution of Delays."

5. RSCI also was given a marginal rating on sub-element 17.f., "Submission of Updated and Revised Progress Schedules." This rating was based on the fact that RSCI continued to fail to follow the official schedule, proposed by it and agreed upon in the contract, in scheduling

work to be performed by its subcontractor and itself on the project at issue.

6. Finally, the Corps of Engineers assessed a marginal rating to RSCI for several sub-elements primarily related to workplace safety: 16.c., 16.d., 16.e., 19.b., and 19.c. As demonstrated in the daily Quality Assurance reports filed by the Corps of Engineers' onsite representatives, Joel Flere and myself, RSCI had ongoing and repeated issues with maintaining a clean, hazard-free work site and assuring that accident prevention measures were taken, such as workers wearing hard hats, correctly using ladders and scaffolding, appropriately tying-off before working at heights, and the maintenance of guard rails.

7. There was a near-miss accident on February 4, 2002, involving Joel Flere and six employees of RSCI's subcontractors, AC & S and Grunwald. There was a used bucket containing a granular chlorination material mixed with water that exploded in the mechanical room while those people were present. The cause of this accident has not been explained, but this is not a normal occurrence. Those individuals closest to the bucket complained of temporary ringing in their ears. It was only luck that prevented more serious injuries from occurring, such as permanent hearing loss, potential burns on the skin and eyes from the spray of the chlorinated mixture, and other workers being affected by the spread of the chlorine fumes. Consistent prioritization of compliance with safety requirements eliminates potential risks and the need for "luck" to avoid accidents.

8. Fortunately, there were no serious injuries or lost time accidents on the project. However, the simple absence of injuries and accidents does not mean that RSCI demonstrated commitment to Engineer Manual 385-1-1, "Safety – Safety and Health Requirements," or the applicable standards of the Occupational Safety and Health Administration. RSCI's noncompliance was well-documented by field staff and Melissa Johnson, the Safety Officer for the Corps of Engineers, Omaha District.

9. My procedure for drafting the performance evaluation of Record Steel and Construction was to review each element of the evaluation and then consider the pertinent facts of the contractor's performance relating to that element. With regards to most elements, I considered the performance of Record Steel and Construction to have been satisfactorily achieved. However, at the time that the evaluation was prepared, I was very familiar with the issues that Record Steel and Construction had with its schedule, as liquidated damages were being assessed, and it is the Corps of Engineers' standard procedure to review the history of a contractor's contract performance to make sure that it is not being unfairly penalized for any potential delays attributable to the Government. At the time of the performance evaluation, I also was very cognizant of the letter and reports provided to Record Steel and Construction regarding ongoing safety issues and concerns.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 23 day of January 2006.

Jennifer S. McQueen